## COLLINS v. METRO–GOLDWYN PICTURES CORPORATION et al.

District Court, S. D. New York.
Nov. 25, 1938.

Harry Weinberger, of New York City (Harold M. Weinberger and Chester A. Pearlman, both of New York City, of counsel), for plaintiff.

J. Robert Rubin, of New York City (David O. Decker, Samuel D. Cohen, and Thomas J. Robinson, all of New York City, of counsel), for defendants.

COXE, District Judge.

The complaint in this suit contains two separate causes of action; one, for copyright infringement, and the other for unfair competition. The subject of the suit is a copyrighted book, entitled "Test Pilot";

782

and the alleged infringing work is a motion picture, also entitled "Test Pilot", produced by the defendants. The plaintiff has moved for a preliminary injunction restraining the further distribution or exhibition by the defendants of their motion picture under the title "Test Pilot". There is also a counter-motion by the defendants for a dismissal of the cause of action relating to copyright infringement on the ground that a mere comparison of the two works fails to show infringement.

The plaintiff is the widow of James H. Collins, a well known flyer and test pilot, who lost his life in an aeroplane accident at Farmingdale, L. I., on March 22, 1935. Prior to his death, Collins had written a number of short articles, mainly about himself and his flying experiences, which were published at various times in magazines and newspapers in the United States. These articles were generally known as "flying stories or air stories", and some of them appeared in a newspaper column under the title "Flying Stories by Test Pilot Jimmy Collins". After Collins' death, a number of the articles were collected by the plaintiff, and published in a book entitled "Test Pilot", which was copyrighted on Sept. 16, 1935. It is alleged in the complaint that the different articles appearing in the book were also separately copyrighted when they were first published, and that the copyrights therefor have been assigned to the plaintiff.

The defendants' motion to dismiss will first be considered. This necessitates a comparison of the plaintiff's book with the defendants' motion picture to see whether by ordinary observation there is sufficient similarity to justify a charge of plagiarism. Dymow v. Bolton, 2 Cir., 11 F.2d 690; Frankel v. Irwin, D.C., 34 F.2d 142; Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119.

The plaintiff's book is a collection of flying stories written by Collins during the last few years of his life. In them, he tells about his boyhood and early poverty, his training in the Army Flying School, his work as a flying instructor, his experiences as a free lance pilot, and how he became the chief test pilot for an aeroplane company. There are vivid descriptions of many of his own flights; there are stories about his more spectacular test dives; there are anecdotes relating to other pilots or persons whom he had known or heard about; and finally there is his own prophetic account of his last test dive, concluding with the words "I am dead now". The book as a whole has no theme or plot, but consists almost entirely of a number of detached and unrelated incidents or episodes in Collins' own life.

The defendants' motion picture is, on the other hand, a well sustained photoplay, which moves along steadily to a conclusion. It is built up around a central character, Jim Lane, the chief test pilot of the Drake Aircraft Company, who flies because he likes to slap "the little lady in blue" (his symbol for the sky). Lane is represented as a skillful but reckless flyer, who drinks heavily and spends his money freely. At the start of the play, he makes a forced landing near Wichita, Kansas, on a transcontinental flight from California to New York, and, while engaged in repairing his engine, is approached by Ann Barton, the daughter of a local farmer, who unexpectedly appears on the scene. Lane thereupon loses all further interest in his transcontinental flight, and elopes the next day with Ann by aeroplane, the marriage taking place soon afterwards at Indianapolis. Upon his return to New York, Lane asks Drake, the president of the Drake Company, for a short honeymoon, and when that is refused, an altercation occurs, and Lane is discharged. The discharge comes just before the National Air Races are to be held at Cleveland, at which Lane is to fly a Drake plane. Benson, another pilot, takes his place, and Lane agrees to fly in the races a specially designed plane of one of his acquaintances. Lane wins the principal race with a purse of $10,000, but Benson, flying the Drake Plane, is killed. Lane thereupon goes to Mrs. Benson and gives her half of his prize money. The balance of the money quickly melts away in the celebration after the victory, which lasts five days. Lane then returns to Ann and shows his contrition in high resolves for the future. He has in the meantime been taken back into the employ of the Drake Company, and proceeds to justify Ann's confidence by starting to lead a sober and industrious life. He first performs a difficult dive test of a pursuit plane, in which the wings twist off, and he saves himself with his parachute. This is followed by an altitude test of a bombing plane, in which the plane crashes, and Gunner, Lane's mechanic, is killed. Lane is then induced to give up his hazardous occupation as a test pilot, and is shown in the last scene happily married, with an infant son, and back in the army "just where he started".

The plaintiff insists that the two works are similar, not only in the characters portrayed but in many of the major incidents. It is first asserted that both have as characters a chief test pilot, a mechanic, the head of an aeroplane company, an official observer, a speed flyer who is killed in an air race, and other minor figures. These are, I think, all perfectly natural to any aeroplane story, and cannot be made the basis of a charge of plagiarism. It is next said that Lane, the central character in the picture, is the counterpart of Collins as described in the book. This comparison will, however, hardly bear analysis. Lane is shown in the picture as a flyer who flies for the pure love of flying; in the beginning, he is a heavy drinker and reckless spender, and then after his marriage he develops into a sober and careful provider. Collins, on the other hand, flies because it satisfies his craving for adventure; he is never a hard drinker, and there is nothing to suggest that he was at any time improvident. The two are alike only in that each is a skillful and daring pilot engaged in perilous work.

The plaintiff lists four major incidents of the picture, which, she says, were lifted from the book. The first of these is Lane's transcontinental flight, which was broken at Wichita, Kansas. Collins also describes a transcontinental flight, in which he stops at Wichita for refueling. There is, however, nothing significant in the fact that both works mention a transcontinental flight; such flights are often attempted, and Wichita is a well known stopping place for transcontinental flying. The second major incident asserted by the plaintiff is the test dive made by Lane, in which the wings twist off and he saves himself with his parachute. Collins had a similar experience, and it is insisted that this indicates copying. The very purpose though of a wing test is to prove the soundness of the wings, and I can see nothing unusual in having the wings come off during such a test. The plaintiff's third major incident is the air race at Cleveland, in which Benson, flying a Drake plane, is killed. Collins, in one of his articles, tells about testing a plane for one of his friends named Devereaux, and then learning afterwards that Devereaux and his wife had been killed in the plane which he had tested. I find no similarity in these incidents. The fourth major incident asserted by the plaintiff is the altitude test at the end of the picture, in which Gunner, the mechanic, is killed. It is said that this is taken from Collins' description of his last dive, in which he lost his life. I can see nothing in common between these two incidents other than the fact that each resulted in a fatal accident.

I am satisfied from this comparison of the two works that there is nothing in the motion picture which was taken from the plaintiff's book. Concededly, the dialogue is different, and I think that any superficial similarities which may exist are mere coincidences and entirely natural to aeroplane stories of the kind in question. It is also apparent from the very nature of Collins' articles that they are largely a recitation of actual facts; and facts in themselves are not protected by copyright. Davies v. Bowes, D.C., 209 F. 53, affirmed 2 Cir., 219 F. 178; International News Service v. Associated Press, 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. I think, therefore, that the defendants' motion to dismiss the first cause of action should be granted.

The plaintiff's motion for a preliminary injunction remains for consideration. It is conceded that the title "Test Pilot" appearing on the book is not protected under the copyright laws. It is contended, however, that the words themselves have become so identified in the public mind with Collins' writings as to mean only the plaintiff's book, and that their use by the defendants amounts to unfair competition.

The Collins book was first published in September, 1935, and although it is alleged that it "received tremendous publicity", I am satisfied from the affidavits that the total sales could not have exceeded 10,000 copies. I do not think, either, that the plaintiff is helped by the earlier publication of the separate articles, for they appeared under varying titles, and it was not until the book was published that the collected articles were, as a group, given the title "Test Pilot".

Prior to the publication of the book in September, 1935, there were other aeroplane stories with the title "Test Pilot", all of which received considerable publicity. In 1926, Doubleday, Page & Co. published a book by Thomson Burtis entitled "Russ Farrell, Test Pilot", containing about 60,000 words. This was a fictional story of a test pilot, and the sales appear to have exceeded 10,000 copies. There was also a story called "Test Pilot" in the Atlantic Monthly in the issue of December, 1932, with a circulation of 100,000 copies. Then there was a short story, also entitled "Test

Pilot", in the May, 1934 issue of the magazine, Blue Book, which had a circulation of over 100,000 copies.

The defendants on January 14, 1933, made public announcement in the Hollywood Reporter of a projected motion picture entitled "Test Pilot" based on the Thomson Burtis book above referred to. The actual production was, however, delayed, and in the meantime the defendants purchased an unpublished story, entitled "Wings of Tomorrow", written by Lieutenant Commander Frank Wead, which was later adapted for filming by Vincent Lawrence and Waldemar Young, and ultimately became the motion picture now charged with infringement.

The defendants' picture was released for general exhibition in April, 1938. It had previously been publicly announced as based entirely on the Wead story, and since its appearance it has been extensively advertised, not only in the public press but in a vast number of picture houses in the United States, under the Wead authorship. In the face of this showing, I do not think that the three fragmentary news items, discovered by the plaintiff, stating that the picture was based on the Collins book, are entitled to any weight. These news items were obviously the work of news writers having no accurate knowledge of the facts, and they have been completely disclaimed by the defendants.

The words "Test Pilot" are merely descriptive; they can no more be appropriated than can other purely descriptive terms. Cooke & Cobb Co. v. Miller, 169 N.Y. 475, 62 N.E. 582; Barrett Chemical Co. v. Stern, 176 N.Y. 27, 68 N.E. 65; Kellogg Co. v. National Biscuit Co., 59 S.Ct. 109, 83 L.Ed. ——, decided by the Supreme Court, Nov. 14, 1938. I do not think, either, that the title has acquired a secondary meaning. Kellogg Co. v. National Biscuit Co., supra. The sales of the plaintiff's book were clearly insufficient to accomplish that result; Manners v. Triangle Film Corp., 2 Cir., 247 F. 301; and the three prior uses of the title shown by the defendants can hardly be reconciled with any idea of a secondary meaning. International Film Service v. Associated Producers, D.C., 273 F. 585. I think, therefore, that the motion for a preliminary injunction should be denied.

The motion of the defendants to dismiss the first cause of action is granted; and the motion of the plaintiff for a preliminary injunction is denied.